**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**

**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN, Sheriff, Jackson Parish in his individual and official capacity; TIM DUCOTE, Warden, Jackson Parish Correctional Center, in his individual and official capacity,**

**Defendants - Appellees**

APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION
HONORABLE TERRY A. DOUGHTY, JUDGE
******************************

**ORIGINAL BRIEF** OF
CARLA D. HALL
Plaintiff - Appellant
********************

NELSON W. CAMERON
Attorney at Law
675 Jordan Street
Shreveport, LA 71101
(318) 226-0111
La. Bar No.: 01283

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**

**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN, Sheriff, Jackson Parish in his individual and official capacity; TIM DUCOTE, Warden, Jackson Prish Correctional Center, in his individual and official capacity,**

**Defendants - Appellees**

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Carla D. Hall, Plaintiff-Appellant

2. Nelson W. Cameron, Counsel for Plaintiff-Appellant

3. Kaitlin A. Wall

   Counsel for Defendants-Appellants

4. Honorable Terry A. Doughty, U.S. District Court Judge, Western District of Louisiana, Monroe Division

*/s/ Nelson W. Cameron*
NELSON W. CAMERON
COUNSEL FOR APPELLANT
CARLA D. HALL

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**

**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN, Sheriff, Jackson Parish in his individual and official capacity; TIM DUCOTE, Warden, Jackson Parish Correctional Center, in his individual and official capacity,**

**Defendants - Appellees**

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff contends that oral argument would assist the Court regarding the issues of whether the intimidating conduct of Sheriff Brown during a meeting about racial discrimination complaints is considered retaliation and whether the voluntary resignation of Plaintiff Hall was constructive discharge and caused by the Sheriff’s conduct and/or an intolerable work environment.

TABLE OF CONTENTS

Certificate of Interested Persons .................. I

Signature Page .................................. ii

Statement Regarding Oral Argument ................ iii

Table of Contents ............................... iv

Table of Authorities ............................ vii

Statement of Jurisdiction ........................ 1

Statement of The Issues .......................... 3

First Issue ................................ 3

Second Issue ............................... 4

Third Issue ................................ 4

Statement of The Case ............................ 4

Summary of Argument .............................. 6

Argument ........................................ 15

First Issue ............................... 15

Did the trial court err by granting summary judgment to Defendant on the grounds that Plaintiff failed to show she suffered an adverse employment action on retaliation when the summary judgment evidence shows she suffered a

credible threat of discharge that would dissuade a reasonable employee from complaining about discrimination?

Standard of Review .................................. 15

Argument ............................................ 18

Related Statutory Materials ......................... 36

Second Issue .................................... 39

Did the trial court err by granting summary judgment to Defendant on the grounds that Plaintiff failed to show she suffered an adverse employment cation when the summary judgment evidence shows she was constructively discharged due to a credible threat of discharge coupled with a hostile work environment?

Standard of Review .................................. 39

Argument ............................................ 39

Third Issue ..................................... 53

Did the district court err by considering inferences in favor of Defendant when it found as a matter of law that Plaintiff did not establish a hostile working environment where both racially offensive conduct and practices contributed?

Standard of Review .................................. 53

Argument: Hostile Working Environment .............. 53

Employer Liability .............................. 70

Conclusion of The Brief ............................ 78

Signature Page ...................................... 78

Certificate and Proof of Service .................. 79

Certificate of Compliance .......................... 80

TABLE OF AUTHORITIES

CASES:

Ackel v. Nat'l Commc'ns, Inc.,
339 F.3d 376, 385 (5th Cir. 2003)....................19

Adams v. Austal, U.S.A., LLC,
754 F.3d 1240, 1257-58 (11th Cir. 2014)............. 61

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255, 106 S. Ct. 2505, 2510-2511, 91 L. Ed. 2d 202 (1986) .................................. 16

Aryain v. Wal-Mart Stores Texas LP,
534 F.3d 473, 484 (5th Cir. 2008) ................... 29

Ash v. Tyson Foods, Inc.,
546 US 454, 456, 126 S.Ct. 1195, 1197 (2006)........ 46

Ayissi-Etoh v. Fannie Mae,
(D.C. Cir. 2013) 712 F.3d 572, 580 .................. 47

Baker v. Weyhauser Co.,
903 F.23d1342, 1346 (10th Cir. 1990)................. 70

Barnes v. McHugh,
No. 12-2491 (E.D. La. July 11, 2013)................ 78

Brown v. Kinney Shoe Corp.,
237 F.3d 556, 566 (5th Cir.2001)..................42,52

Burge v. Parish of St. Tammany,
187 F.3d 452, 464 (5th Cir.1999) .............15,39,53

Burlington Indus. v. Ellerth,
524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)..........................................71

Burlington N. & Santa Fe Ry. Co. v. White,
126 S.Ct. 2405 , 548 U.S. 53 , 165 L.Ed.2d 345 , 74 USLW 4423 (2006) .....14,19,20,25,26,27,29, 30,31,35,36

Chaney v. Plainfield Health Ctr,
612 F.3d 908, 913 (7th Cir. 2010).................... 62

Crawford v. Carroll ,
529 F.3d 961, 974 (11th Cir. 2008)................... 27

Daniel v. T & M Protection Resources, LLC
689 Fed. Appx. 1(2nd. Cir. 2017) .................... 49

Davis v. Fleming Cos.,
55 F.3d 1369, 1372 (8th Cir. 1995) ...................77

Dey v. Colt Const. & Develop. Co.
28 F.3d 1446, 1455 (7th Cir. 1994)................... 59

E.E.O.C. v. Collegeville/Imagineering,
2007 WL 2051448, at *8 (D. Ariz. July 16, 2007)......25

Equal Employment Opportunity Commission v. JBS USA LLC,
339 F. Supp. 3d 1135, 1187 (D. Kan. 2018) ...........26

Ezell v. Potter,
400 F.3d 1041, 1048 (7th Cir. 2005).................. 48

Farragher v. City of Boca Raton,
(1998) 524 US 775, 787-788, 118 S.Ct. 2275, 2283....................................... 59,71

Foster v. Swift & Co.,
615 F2d 701 (5th Cir. 1980) ........................ 17

Hall v. Gus Const. Co. Inc,
842 F.2d 1010, 1013-104 (8th Cir. 1988).............. 63

Hamilton v. Dallas Cnty,
79 F.4th 494, 506 (5th Cir. 2023)................... 29

Harris v. Forklift Systems, Inc.,
510 U.S. 17 at 22, 114 S.Ct. 367 at 370 (1993)
....................................... 53,58,55,59,60

Harrison v. Metro. Gov't of Nashville & Davidson Cty.,
80 F.3d 1107, 1119 (6th Cir. 1996) ................. 25

Hawkins v. Anheuser-Busch, Inc.,
517 F.3d 321, 335 (6th Cir. 2008)..................61,62

Hayes v. G&E Real Estate Mgmt. Servs.,
No. 24-cv-01459 2025 WL 769162, at *6 (S.D.N.Y. Mar. 10, 2025)........................................ 29

Heurer v. Welil-McLain,
203 F.3d 1021, 1023 (7th Cir. 2000)................. 25

Hicks v. Gates Rubber Co.,
833 F.2d 1406 (10th Cir. 1987)...................... 63

Hunt v. Cromartie,
526 U.S. 541, 119 S. Ct. 1545 at 1551-52, 143 L. Ed. 2d 731 (1999)....................................... 16

Huston v. Procter & Gamble Paper Products Corp.,
568 F.3d 100, 105, fn 4 (3rd Cir. 2009).............. 70

Johnson-Luster v. Wormuth,
Civ. A. No. 19-2235 2022 WL 767837(E.D. La. Mar. 14, 2022)........................................... 51

Killen v. NW. Human Servs., Inc.,
2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007)..... 25

Lauderdale v. Tex. Dep't of Crim. Justice,
512 F.3d 157 (5th Cir. 2007) ................. 42,51,52

Lee v. Winter,
439 F. Supp. 2d 82, 85 (D.D.C. 2006)................ 26

Martin v. Gates,
2008 WL 4657807 at *10-11 (D. Haw. Oct. 20, 2008)....26

McGinest v. GET Service Corp,
360 F3d 1103, 1117 (9th Cir. 2004) .................. 61

McKinney v. Dole,
765 F.2d 1129, 1139 (D.C.Cir.1985).................. 63

Meritor Sav. Bank, FSB v. Vinson,
477 US 57, 66, 106 S.Ct. 2399, 2404-2405 .........58,70

Monaghan v. Worldpay US, Inc.,
955 F.3d 855 (11th Cir. 2020)....................... 27

Moore v. Jackson Pub. Sch. Dist.,
No. 3:23-CV-3092-CWR-LGI, 2024 WL 3687098 (S.D. Miss. Aug. 6, 2024)
.................................................... 29

National R.R. Passenger Corp. v. Morgan,
536 US 101, 116 122 S.Ct. 2061, 2074, fn 10.(2002).. 58

Parries v. Makino, Inc.,
122 Fed. Appx. 826, 830 (6th Cir. 2004)............. 25

Perret v. Nationwide Mut. Ins. Co.,
770 F.3d 336, 338-39 (5th Cir. 2014)..............40,41

Purcell v. Seguin State Bank & Trust Co.,
999 F.2d 950, 957 (5th Cir.1993).................... 17

Ray v. Iuka Special Mun. Separate Sch. Dist.,
51 F.3d 1246, 1251 (5th Cir.1995)................... 18

Reed v. Procter & Gamble Mfg. Co.
(6th Cir. 2014) 556 Fed. Appx. 421, 433 n.2)........ 48

Reeves v. Sanderson Plumbing, Inc.,
530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed.
2d 105 (2000) .................................. 16,17

Rochon v. Gonzales,
438 F.3d 1211 (D.C. Cir. 2006) ..................... 28

Rodgers v. Western Southern Life Ins. Co.,
12 F.3d 668, 675 (7th Cir. 1993).................... 47

Rogers v. Equal Employment Opportunity Comm'n,
454 F.2d 234, 238 (5th Cir.1971), cert. denied, 406
U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343
(1972).............................................. 54

Shackelford v. Deloitte & Touche, LLP,
190 F.3d 398, 403 n. 2 (5th Cir.1999)............... 19

Smelter v. S. Home Care Servs.,
904 F.3d 1276, 1286 (11th Cir. 2018)................ 48

Smith v. Xerox Corp.,
602 F.3d 320, 327 (5th Cir. 2010).................... 50

Spriggs v. Diamond Auto Glass,
242 F.3d 179, 185 (4th Cir. 2001).................... 48

Steiner v. Showboat Operating Co.,
25 F.3d 1459, 1462-63 (9th Cir.1994) .................60

Stripling v. Ingram Barge Co.,
No. 3:21-cv-00654 (M.D. Tenn. Dec. 6, 2022) ........ 28

Thomas v. Texas Dep't of Criminal Justice,
220 F.3d 389 (5th Cir. 2000).......................... 27

Thompson v. North American Stainless, LP,
562 U.S. 170 (2011).................................. 24

Torgerson v. City of Rochester ,
643 F.3d 1031 (8th Cir. 2011)........................ 77

United States v. Diebold, Inc.,
369 US 654, 82 LEd 2d 176, 825 SCt 993 (1962)...... 17

Walsh v. Irvin Stern's Costumes,5
2006 WL 2380379, at *2 (E.D. Pa. Aug. 15, 2006)..... 25

Waltman v. International Paper Co.,
875 F.2d 468, 482 (5th Cir. 1989).................... 70

Wantou v. Wal-Mart Stores Tex., L.L.C.,
23 F.4th 422 (5th Cir. 2022) ........................ 78

Watts v. Kroger Co.,
170 F.3d 505, 509–10 (5th Cir.1999).................. 72

Williams v. General Motors Corp,
187 F.3d 553, 563 (6th Cir. 1999).................... 63

Williams v. W.D. Sports, N.M., Inc.,
497 F.3d 1079, 1090 (10th Cir. 2007)............. 25,26

Woods v. Cantrell,
29 F.4th 284, 285 (5th Cir. 2022).................... 47

Ziskie Mineta,
547 F.3d 220, 225 (4th Cir. 2008) ................... 61

Statues:

Fed. R. Civ. P.56................................ 16,24

28 U.S.C. §1292(b)................................... 1

42 U.S.C. § 12203 ................................. 37

Title VII ........... 14,19,23,29,33,53,56,59,62,63,64

29 C.F.R. § 1630.12 ............................... 37

29 C.F.R. § 1636.5(f)(2) .......................... 38

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**
**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN, Sheriff, Jackson Parish in his individual and official capacity; TIM DUCOTE, Warden, Jackson Parish Correctional Center, in his individual and official capacity,**
**Defendants - Appellees**

## STATEMENT OF JURISDICTION

The United States Court of Appeals for the Fifth Circuit has jurisdiction over this matter pursuant to 28 U.S.C. §1292(b).

On January 3, 2025, Honorable Terry A. Doughty of the United States District Court for the Western District of Louisiana granted summary judgment in favor of Defendants-Appellant, dismissing all claims of Plaintiff Carla D. Hall. ROA.3294. On February 18,

2025, Plaintiff filed her Motion to Reconsider the grant of summary judgment. ROA.3306. On February 26, 2025, Judge Doughty denied Plaintiff's Motion to Reconsider the grant of summary judgment. ROA.3345. On March 26, 2025, Plaintiff filed her Notice of Appeal. ROA.3373.[1]

[1] An error occurred in the docket concerning the filing of the Notice of Appeal. After briefing and a hearing, Judge Doughty issued an indicative order on February 12, 2026, to correct the record to reflect the accurate filing date of Plaintiff's Notice of Appeal is March 26, 2025. ROA.3390.

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**

**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN, Sheriff, Jackson Parish in his individual and official capacity; TIM DUCOTE, Warden, Jackson Parish Correctional Center, in his individual and official capacity,**

**Defendants - Appellees**

## STATEMENT OF THE ISSUES

### FIRST ISSUE

Did the trial court err by granting summary judgment to Defendant on the grounds that Plaintiff failed to show she suffered an adverse employment action on retaliation when the summary judgment evidence shows she suffered a credible threat of discharge that would dissuade a reasonable employee from complaining about discrimination?

SECOND ISSUE

Did the trial court err by granting summary judgment to Defendant on the grounds that Plaintiff failed to show she suffered an adverse employment cation when the summary judgment evidence shows she was constructively discharged due to a credible threat of discharge coupled with a hostile work environment?

THIRD ISSUE

Did the district court err by considering inferences in favor of Defendant when it found as a matter of law that Plaintiff did not establish a hostile working environment where both racially offensive conduct and practices contributed?

## STATEMENT OF THE CASE

On August 20, 2021, Petitioner Carla Hall filed her Complaint asserting several causes of action including a racially hostile work environment, retaliation and constructive discharge. ROA.24 The Jackson Parish Sheriff hired Carla Hall as a RN to work at the Jackson Parish Correctional Center, providing medical care to

I.C.E. detainees. The case followed the usual discovery development.

On October 21, 2024, Defendants LaSalle Management Company, LLC, Jackson Parish Sheriff Andy Brown, and Warden Tim Ducote filed their Motion for Summary Judgment asserting in part that Plaintiff could not establish a prima facie case due not having proof of an adverse employment action, constructive discharge or a hostile work environment. ROA.383. Defendants filed a list of alleged uncontested facts. ROA.1821. And they filed a memorandum and exhibits in support. ROA.1825. On November 26, 2024, Plaintiff filed her Opposition arguing among other issues that she was subjected to a racially hostile work environment, was retaliated against due to threats of discharge if she complained again and then was constructively discharged due to the intolerable work conditions. ROA.2870. She also filed her responses to Defendants' Statement of

Uncontested Facts. ROA.2960. Plaintiff's Exhibits begin at ROA.2965.

The Court granted summary judgment dismissing all claims with prejudice on January 3, 2025. ROA.3294. Plaintiff filed a Motion to Reconsider on January 28, 2025 arguing in part that the Sheriff's threats to her to "hit the door" were threats to discharge and that threat was materially adverse and constituted retaliation. ROA.3306. The district court denied the Motion for Reconsideration on February 26, 2025. ROA.3345. On March 26, 2025, Plaintiff filed her Notice of Appeal. ROA.3372.

## SUMMARY OF ARGUMENT

Plaintiff is a black female who worked as a RN nurse for the Jackson Parish Sheriff at the Jackson Parish Correctional Center ("JPCC") beginning March 2019 until her date of resignation on September 25, 2019. In 2019, Sheriff Brown in his official capacity

operated the JPCC. JPCC is owned by LaSalle Management Company, LLC (LMC). LMC assists the Sheriff to administer his JPCC operations, particularly the nurses. For various periods of time, Sheriff Brown has also housed Louisiana Department of Corrections inmates there, receiving the state per diem rate.

Beginning in March 2019, Sheriff Brown and LMC made an agreement with the U.S. Department of Immigration, Control and Enforcement (I.C.E.) to house detained illegal immigrants at JPCC. The ICE rate of per diem was much higher. However, I.C.E. required additional medical personnel including a Director of Nursing, Health Services Administrator, Mental Health nurse, Assistant to the Nurse Practitioner, Quality Assurance Nurse, and a dentist.

The Sheriff hired Plaintiff Carla Hall, an African American, on March 25, 2019, at the rate of $33.00 per hour. Exhibit 3. ROA.3119. Exh CH-DEC ¶3. ROA.2965.

Sheriff Brown offered Plaintiff Hall a promotion to the Director of Nursing (DON) position around April 30, 2019. Sheriff Brown and Warden Ducote agreed upon the rate of pay of $36.00 per hour until more money was available. ROA.3120. Sheriff and Ducote also promised training for Nurse Hall in Texas and that the LMC physician, Dr. Pamela Hearn, would train and assist her. Neither assistance nor training was ever provided to Ms. Hall. Exh CH-DEC ¶3. ROA.2965. During an I.C.E. inspection on May 30, 2019, Defendant Sheriff Brown was asked by ICE who was his Health Service Administrator (HSA); he replied it was Plaintiff Hall. Thus, Nurse Hall was given this additional job without any increase in pay. The DON and HSA positions are two separate full time positions. But Nurse Hall was required to hold and work both positions without additional pay. Sheriff Brown indicated he would see what could be done on the pay. I.C.E. regulations also

required the other additional positions be filled (i.e, Mental Health nurse, Assistant to the Nurse Practitioner, Quality Assurance Nurse). Plaintiff Hall requested several times that the required positions be filled but they were not filled, thereby greatly increasing Hall's work load. Exh CH-DEC ¶4. ROA.2966

On May 24, 2019, Nurse Hall met with Warden Ducote and Kevin Sumrall, a LMC, representative. Exh CH-DEC ¶5. ROA.2967. Plaintiff Hall requested again the additional personnel and the increase in pay. Again, although assurances were expressed, it was declined through inaction. As a consequence, was often working into the night. And the increase in hours, duties and responsibilities was not accompanied by an increase in pay. Nor was it accompanied by training so she could understand the new, additional duties and responsibilities of her new job titles. Exh CH-DEC ¶¶2965-2967.

On or about July 1, 2019, Plaintiff Hall told Warden Ducote that she could not do the work of the two positions without additional pay. She stepped down to a RN position but first trained her replacement, a white female, Jessie Reison. Exh CH-DEC ¶5. ROA.2967.

Plaintiff contends that there existed discriminatory practices along with offensive conduct which created a racially hostile working environment. See Hall's Sworn Declaration, Paragraphs 6-7. ROA.2967. Sheriff Brown failed to provide the training necessary and appropriate staffing. The summary judgment evidence in the form of Declarations that show after Ms. Hall stepped down, many of those same positions were filled with whites by her white replacement, Nurse Reison. Exh CH-Dec. ¶6(4), ROA.2968. Record Excerpts (RE), Tab 4. Other black nurses resigned due to the racially discriminatory culture.

Once Reison was made DON/HSA, she changed practices in the medical unit that adversely impacted black nurses in general and Ms. Hall in particular, contributing to the creation of a hostile work environment. Exh CH-Dec. ¶6, ROA.2967. RE Tab 4. There was an unspoken racial culture at JPCC that blacks were treated less favorably than whites. Exh CH-DEC ¶7. ROA.2969. Others confirm. Nurse MacFarland. ROA.2988. RE Tab5. Nurse Lester. ROA.2995 ¶6. RE Tab 6.

On July 18, 2019, Warden Ducote and Sheriff Brown met with Nurse Hall. They were aware of complaints of race discrimination. She made Brown and Ducote aware of her complaints. Exh CH-DEC ¶8. ROA.2970. RE Tab 4. On July 22, 2019, a racial epithet was used on a training video. Exh CH-DEC ¶9. ROA.2971.

On August 7, 2019, Sheriff Brown and Warden Ducote called a meeting of all nurses to be held in Warden Ducote’s office. Exh CH-DEC ¶11. ROA.2973. RE Tab 4.

Warden Ducote was aware of a racially based conflict among nurses. Exh TD 50:9. ROA.3113. The Sheriff can't deny knowing as well. Exh AB-2 27:22. (6/24/24) ROA.3095. The meeting was called deliberately for the sole purpose to obstruct and silence complaints about race discrimination from the nurses. The Sheriff told the nurses' group on August 7, 2019, that he had heard of racial "bickering" and complaints among the nurses. And the Sheriff and Ducote were aware of Hall's complaints made directly to them. He told the group that if they didn't like how things were that they could "hit the door" and that he would fire any who made complaints. Exh CH-DEC ¶11. ROA.2973. RE Tab4. Other nurses confirm this. Nurse MacFarland,¶8. ROA.2989. RE Tab 5. Nurse Lester. ¶10. ROA.2996. RE Tab 6. The Sheriff was upset during the meeting, according to Warden Ducote. Exh TD 52:17. ROA.3115. Black nurses were intimidated by the Sheriff as he was

very aggressive and was the chief law enforcement officer of the Parish. It brought some to tears. Exh CH-DEC ¶11. ROA.2973. RE Tab 4. Exh DH-DEC ¶12. ROA.2983. Nurse Lester. ¶10. ROA.2996. RE Tab 6. Hall even considered moving her home. Exh CH-DEC ¶11. ROA.2973.

Ms. Hall put in her resignation on the same day, August 7, 2019, as the meeting. Exh CH-DEC ¶¶12-13. ROA.2975-2976, RE Tab 4. Exh 10, pp 2-4. ROA.3124. The Sheriff convinced her to stay saying things would be better and apologizing for the yelling but not for what he said. But when the culture did not change, she resigned and was constructively discharged on September 25, 2019. Exh CH-DEC ¶¶12-13. ROA.2975-2976 Exh 10, pp 2-4. ROA.3124.

Plaintiff argues that she suffered retaliation during the specifically scheduled August 7, 2019, meeting, with the threats to fire her if she complained

any further because the intimidation dissuaded her from making any further complaints of discrimination. The controlling rule comes from the Supreme Court's materially-adverse standard: retaliation is actionable if the employer's conduct would likely dissuade a reasonable worker from engaging in protected activity, not only if it changes formal terms or conditions of employment. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). The Sheriff, not merely a supervisor, attempted to silence discrimination complaints, or to present continued employment as inconsistent with asserting rights under Title VII is a severe form of retaliation. Credible threats, coming from the chief law enforcement officer of the Parish to fire are a form of retaliation.

Plaintiff further argues that coupled with the threats, severe forms of harassment (i.e., use of the "N" word and pervasive hostility, her resignation is a

constructive discharge due to intolerable working conditions.

Last, Plaintiff contends that the work environment as a whole was hostile.

## ARGUMENT

### FIRST ISSUE

> Did the trial court err by granting summary judgment to Defendant on the grounds that Plaintiff failed to show she suffered an adverse employment action on retaliation when the summary judgment evidence shows she suffered a serious threat of discharge that would dissuade a reasonable employee from complaining further about discrimination?

Standard of Review

This Court reviews the district court's summary judgment decision de novo, applying the same standards as the district court. Burge v. Parish of St. Tammany, 187 F.3d 452, 464 (5th Cir.1999).

Summary judgment should be granted only where "there is

no genuine issue as to any material fact” and “the moving party is entitled to judgment as a matter of law”. Fed. R. Civ. P. 56(c). In making its determination, the court should view the facts in the light most favorable to the non-moving party and draw all inferences in that party’s favor. Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2510-2511, 91 L. Ed. 2d 202 (1986).

Even when the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues. Hunt v. Cromartie, 526 U.S. 541, 119 S. Ct. 1545 at 1551-52, 143 L. Ed. 2d 731 (1999). (Where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary

judgment stage). The court should review the record as a whole, but it must disregard all evidence favorable to the employer that the jury is not required to believe. Thus, if the employer's evidence is contradicted, or comes from an interested witness, it cannot be credited unless it is favorable to the plaintiff. Reeves, *supra*, 119 S. Ct. at 2100.

A motion for summary judgment should not be granted even if there are no genuine issues of fact, but there are **conflicting inferences** which may be reasonably drawn from the facts. United States v. Diebold, Inc., 369 US 654, 82 LEd 2d 176, 825 SCt 993 (1962). It is of particular importance where the inferences deal with subjective feelings and intent. Foster v. Swift & Co., 615 F2d 701 (5th Cir. 1980); See Purcell v. Sequin State Bank & Trust Co., 999 F.2d 950, 957 (5th Cir.1993) (noting that it is not unusual for a discrimination case to consist mostly of circumstantial

evidence); and Ray v. Iuka Special Mun. Separate Sch. Dist., 51 F.3d 1246, 1251 (5th Cir.1995) (acknowledging that even when the evidence is less than compelling, it is not the appellate court's role to weigh the evidence).

Argument

The district Court found that "The record evinces no act or acts severe or pervasive enough to have altered the conditions of her employment, let alone forced her involuntary resignation." Under its Retaliation analysis and ruling, it incorrectly found, "We have already determined that Nurse Hall was not subjected to an adverse employment action." The court did not analyze whether the August 7, 2019, meeting constituted a "materially adverse employment action" but instead seemed to use the outdated adverse employment action standard which required an ultimate employment decision such as discharge or a demotion.

The trial court singularly failed to analyze whether retaliation arose from the August 7, 2019, meeting called by Sheriff Brown. The controlling rule comes from the Supreme Court’s materially-adverse standard: retaliation is actionable if the employer’s conduct would likely dissuade a reasonable worker from engaging in protected activity, not only if it changes formal terms or conditions of employment. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

A prima facie case of retaliation under Title VII contemplates three elements: “(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action.” Ackel v. Nat’l Commc’ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted)[2].

---

[2] The standard of proof for Title VII discrimination claims also applies to § 1981 claims, Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 403 n. 2 (5th Cir.1999).

Prior to this meeting there had been several miscellaneous complaints by Plaintiff Hall and other nurses of racial discrimination. Second a materially adverse employment action (i.e., an action that would dissuade a reasonable employee from complaining about discrimination) took place on August 7, 2019, when the Sheriff intimidated the nurses; yelled; slammed his hand on the desk and told all including Plaintiff Hall to hit the door if she felt the need to complain about race discrimination. Burlington N. & Santa Fe Ry. Co. v. White, supra. requires only that an employment action to be materially adverse, meaning it would deter a reasonable employee from engaging in protected activity. This is exactly the apparent meaning that Sheriff Brown intended to convey was either leave your job or don't make any more race discrimination complaints.

Ms. Hall engaged in a protected activity when she

complained on July 22, 2019 about a training video and a non-training video which contained derogatory racial epithets EXH-CH-DEC ¶9. ROA.2971. Nurse Hall also made complaints about race discrimination in a meeting with Sheriff Brown and Warden Ducote on July 18, 2019. EXH-CH-DEC ¶8. ROA.2970. Even then Hall was firmly told that they (Ducote and Brown) don’t need that kind of talk at work.

At the time of the August 7, 2019, meeting, the evidence is plaint that Sheriff and Warden knew of complaints of prior race discrimination since that was the focus of that meeting and they had heard complaints from Hall beforehand. Ducote was aware of complaints of which he related to the Sheriff. Exh TD 44:8-20 and 23-25. ROA.3112.

On August 7, 2019, Sheriff Brown and Warden Ducote called a meeting of all nurses to be held in Warden Ducote’s office. Warden Ducote was aware of racial

conflicts among nurses. Exh TD 50:9. ROA.3113. The Sheriff told the group they had heard of racial "bickering" and complaints among the nurses. He told the group that if they didn't like how things were that they could "hit the door", meaning if they wish to continue to make racial complaints that he would fire any who made complaints. Exh CH-DEC ¶11.(Hall) ROA.2973. RE Tab 4. Other Nurses heard the same thing. Exh DH-DEC ¶12 (Hill) ROA.2982.

Warden Ducote agreed that the Sheriff was upset during the meeting. Exh TD 52:16. ROA.3115. Black nurses were intimidated by the Sheriff as he was very loud and aggressive. He was the chief law enforcement officer for the Parish. He brought some to tears. Exh CH-DEC ¶11. ROA.2973. Exh DH-DEC ¶12. ROA.2982. "He raised his voice; he was loud and threatening." "Ms. Hill and other nurses were shaking and brought to tears." They were intimidated due to be a high ranking

law enforcement official.

On the Title VII retaliation claim, Plaintiff has alleged direct evidence that the Sheriff told the nurses to either work with the discriminatory practices in place or "hit the door" and also directed Hall to stop discussing claims of discrimination. Exh CH-DEC ¶11.(Hall) ROA.2973. Others heard the same thing. Exh DW-DEC ¶12 (Hill) ROA.2982. All took it as "an effort to intimidate nurses to stop them from making any complaint about race discrimination." "He (Sheriff Brown) said he would fire anyone who continued to complain about race." ROA.2982. Plaintiff Hall interpreted the Sheriff as making "veiled threats to fire her if she had any complaints." Hall took the berating by the Sheriff "as an effort to suppress her voice and the voices of other black nurses about race discrimination." ROA.2973.

These sworn Declarations are competent summary

judgment evidence. FRCP Rule 56(c)(1)(A)( ". . . affidavits or declarations. . .") They establish the creation of a retaliatory work environment with a threat to fire if make any more complaints of employment discrimination. This threat standing alone is retaliation. For retaliation purposes, a materially adverse employment action is one which dissuades a worker from engaging in protected activity.

Threats to fire an employee for making a complaint of discrimination or to fire if make another complaint is actionable. See Thompson v. North American Stainless, LP, 562 U.S. 170 (2011), (anti retaliation provisions must be read broadly).

Plaintiff in her Opposition to summary judgment cited several other cases supporting her position. The following is quoted from the brief at ROA.2904

> Threats sufficient to deter an employee from engaging in protected activity may include threats to terminate employment, reduce

compensation, or impose administrative leave. Heurer v. Welil-McLain, 203 F.3d 1021, 1023 (7th Cir. 2000)(efforts to prevent the filing of a claim); Parries v. Makino, Inc., 122 Fed. Appx. 826, 830 (6th Cir. 2004)(threats of retaliation combined with employee fear sufficient)[3]; Harrison v. Metro. Gov't of Nashville & Davidson Cty., 80 F.3d 1107, 1119 (6th Cir. 1996)(supervisor stated he would not hesitate to run the testifying employees out of his department); E.E.O.C. v. Collegeville/Imagineering, 2007 WL 2051448, at *8 (D. Ariz. July 16, 2007) (concluding plaintiff put forth prima facie evidence of material adverse action by showing supervisor with requisite power threatened to terminate plaintiff); Killen v. Nw. Human Servs., Inc., 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007) (finding that the threat of placement on administrative leave could have dissuaded a reasonable employee from making a discrimination claim). "A fair reading of [Burlington] reveals that the case imposes no requirement that a threat be fulfilled." Walsh v. Irvin Stern's Costumes, 2006 WL 2380379, at *2 (E.D. Pa. Aug. 15, 2006); see also Williams v. W.D.

---

[3] Alternate citation: Parries v. Makino, Inc. 2004 F.App. 1086N (6th Cir. 2004)

> Sports, N.M., Inc., 497 F.3d 1079, 1090 (10th Cir. 2007) (finding combination of threats and actions could dissuade reasonable employee). Lee v. Winter, 439 F. Supp. 2d 82, 85 (D.D.C. 2006) (finding threat of reduced compensation constitutes materially adverse action after *Burlington*); Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1090 (10th Cir. 2007) ("We do not doubt that a reasonable employee could well find . . . a combination of threats and actions taken with the design of imposing both economic and psychological harm sufficient to dissuade him or her from making or supporting a charge of discrimination."); Equal Employment Opportunity Commission v. JBS USA LLC, 339 F. Supp. 3d 1135, 1187 (D. Kan. 2018) ("certain threats of future adverse action can constitute a materially adverse employment action"); Martin v. Gates, 2008 WL 4657807 at *10-11 (D. Haw. Oct. 20, 2008) (finding that employee made a prima facie claim of retaliation where employer made threat of severe disciplinary action).

Moreover, cases in the Fifth Circuit where the decision-maker shouts at the plaintiff about making complaints among other actions supports a finding of

intent to retaliate. Thomas v. Texas Dep't of Criminal Justice, 220 F.3d 389 (5th Cir. 2000)("Thomas also presented evidence that one of her superiors shouted at her about her filing grievances against TDCJ.")

And other federal appellate courts have applied that principle to credible threats of termination. In Monaghan v. Worldpay US, Inc., 955 F.3d 855 (11th Cir. 2020), the Eleventh Circuit rejected the lower court's view that threats to terminate or replace the employee were too insubstantial and held the retaliation claim belonged before a jury under *Burlington*'s standard. The Eleventh Circuit found:

> But the proper standard in a retaliation case is the one set out by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White* , 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), and confirmed by this circuit in *Crawford v. Carroll* , 529 F.3d 961, 974 (11th Cir. 2008) —the retaliation is material if it "well might have dissuade[d] a reasonable worker from making or supporting a charge of

discrimination."

The D.C. Circuit also supports the breadth of the federal rule. It held that retaliation covers materially adverse conduct whether or not it is directly related to employment terms, so long as it could dissuade a reasonable worker from complaining. Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006). Although *Rochon* does not involve a firing threat, it is important because it confirms that federal retaliation doctrine is not confined to formal personnel actions. A supervisor's threat to fire is therefore comfortably within the category of conduct a court may treat as actionable if deterrent.

Several more district court decisions support the same answer. One Court observed that threats of retaliation can plausibly support a retaliation claim and even contribute to constructive discharge allegations, Stripling v. Ingram Barge Co., No. 3:21-

cv-00654 (M.D. Tenn. Dec. 6, 2022). Another court explained that the risk of being fired is exactly the kind of harm that could deter a reasonable worker from complaining. Moore v. Jackson Pub. Sch. Dist., No. 3:23-CV-3092-CWR-LGI, 2024 WL 3687098 (S.D. Miss. Aug. 6, 2024). A Southern District of New York decision likewise reiterated that threats of negative employment consequences may satisfy *Burlington's* standard. Hayes v. G&E Real Estate Mgmt. Servs., 2025 WL 769162, at *6 No. 24-cv-01459 (S.D.N.Y. Mar. 10, 2025).

But the trial court cited only two cases which were not on point: first, Hamilton v. Dallas Cnty, 79 F.4th 494, 506 (5th Cir. 2023)("Today we hold that a plaintiff plausibly alleges a disparate-treatment claim under Title VII if she pleads discrimination in hiring, firing, compensation, or the "terms, conditions, or privileges" of her employment.");second, Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 484 (5th Cir.

2008)(considering constructive discharge in the context of sexual harassment). The trial court did not consider the threat to fire on its own as a form of retaliation. It skipped right over considering the threats to fire as retaliation standing alone and examined no case law directly bearing upon the issue.

The threats in the meeting were not of the type of behavior the *Burlington* Court designated as " . . . petty slights, minor annoyances, and simple lack of good manners ...." The called meeting was for the purpose of berating and intimidating employees as not what the High Court excluded from actionable conduct such as "personality conflicts at work that generate antipathy" or "snubbing by supervisors and co-workers". Burlington, supra 548 U.S. 68. Here, the intimidation was not confined to Plaintiff Hall. At least four nurses, including Hall, who attended the meeting came to the same conclusion that the Sheriff was adamant and

serious about letting nurses go who made race complaints. Exh CH-DEC ¶11.(Hall) ROA.2973. Others heard the same thing. Exh DH-DEC ¶12 (Hill) ROA.2982. Exh AFM-DEC ¶8 (McFarland). ROA.2989-2990.[4] Exh CL-DEC ¶10 (Lester). ROA.2996. The Sheriff went out of his way by yelling and slamming his hand on the desk and making the pointed threat to "hit the door".

The Burlington Court also required there be some harm caused by the retaliation. Here, Nurse Hall was so shaken by the Sheriff's threats that she seriously considered moving her home. Exh CH-DEC ¶11 ROA.2973. Further, in conjunction with other incidents, Ms. Hall suffered sleeplessness, depression, and anxiety among

[4] McFarland further testified under oath that the Sheriff raised his voice, was loud, threatening and yelled at her. The Sheriff told her specifically that "you can get out now"and "you can leave and don't come back." She attested, " . . . (Sheriff) said he'll get rid of anyone who keeps up with racial complaints." ROA.2990.

several other serious symptoms. Exh CH-DEC ¶15. ROA.2975

The trial court cited none of these cases nor attempted to distinguish their applicability. ROA.3294. ROA.3345. Plaintiff specifically argued that the threat of ″hit the door″ if any further complaints were made was retaliation. ROA.2903. However, this form of retaliation not addressed by the trial court.

The trial court's error is pronounced in its Reconsideration Memorandum Order. ROA.3345. On the last page, Judge Doughty wrote that Plaintiff requests reconsideration because the Court did not consider "materially adverse employment action" concerning the threats at the meeting. He then listed certain actions the Court considered including, the nurses' meeting where Judge Doughty did not mention any threat to fire and noted the nurses were merely "hollered at". Judge Doughty specifically wrote, "none of these episodes

qualified as an adverse employment action are required by Title VII." ROA.3347. The question concerning the threats to fire were not whether the threats standing alone constituted adverse employment actions but whether it constituted a form of retaliation because it dissuaded an employee from making a race discrimination complaint.

Courts have considered such threats capable of constituting retaliation by constraining the employee from making a complaint of employment discrimination. A jury should decide this issue because Nurse Hall set forth sufficient evidence to provide a reasonable basis for a jury to believe the threats and attitude by the High Sheriff dissuaded her from making or supporting a complaint of discrimination. And it dissuaded her from making an internal complaint. She instead later resigned effective September 25, 2019.

Further, Plaintiff argued applicable human resource standards supported her position,

> According to Dianne Thomas, Plaintiff's Expert in human resources, such an outburst by the Sheriff was against all authoritative human resource HR standards. Exh DT-2, pg 5 "Handling Complaints". The Sheriff and his policy should encourage employees to notify him of outstanding race complaints. Expert Thomas inferred from Hall's testimony that the Sheriff threatened nurses with discharge.
>
> ROA.3009

Nurses felt the same intimidating influence. Report, page 6 (. . . " chose to intimidate and use threatening language that he would fire them . . . . ") ROA.3009. The Sheriff was aggressive by shouting and pounding on the desk. Exh CH-DEC ¶11. ROA.2973. Exh AFM-DEC ¶8; ROA.2989-2990[5]. Exh CL-DEC ¶10. ROA.2996. (Sheriff ". .

[5] McFarland further testified under oath that the Sheriff raised his voice, was loud, threatening and yelled at her. The Sheriff told her specifically that "you can get out now"and "you can leave and don't come back." She attested, " . . . (Sheriff) said he'll get

. screamed at Nurse McFarland). ROA.2997. Some nurses were shaking and brought to tears. Exh DH-DEC ¶12. ROA.2983. Ms. Hall was so shaken she later considered moving her household. Nurse Lester, Declaration ¶10. ROA.2974. The ultimate hiring and firing authority like the Sheriff telling an employee that another complaint will lead to termination is almost a textbook example of conduct designed to chill protected activity. It targets access to the complaint process itself, which is exactly what *Burlington* said the anti-retaliation provision protects.

The governing legal standard readily encompasses such threats as what the Sheriff made. Under Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), the central inquiry is whether the employer's conduct would likely deter a reasonable worker from making or

---

rid of anyone who keeps up with racial complaints."
ROA.2990.

supporting a discrimination complaint.[6] A supervisor telling an employee that another complaint will lead to termination is a textbook example of conduct designed to chill protected activity. It targets access to the initial internal complaint process itself, which is exactly what *Burlington* said the anti-retaliation provision protects.

The scenario becomes even stronger when the threat is expressly conditional: if you complain again, you will be fired. Conditionality supplies the causal link between the protected activity and the threatened harm. It is not merely a generalized management warning or stray remark; it is retaliation in its most direct form because it penalizes or seeks to prevent future opposition to discrimination.

*Related Statutory Materials*

---

[6] The trial court never cited *Burlington* further highlighting the court’s misunderstanding of the cause of action.

Other statutes expressly prohibit coercion, intimidation and threats. These prohibitions are intrinsic to anti-retaliation laws. The ADA statutory text is especially telling on that point because it expressly prohibits threats and intimidation tied to protected rights, 42 U.S.C. § 12203, 42 U.S.C. § 12203. Compare 29 C.F.R. § 1630.12 29 C.F.R. § 1630.12 (ADAAA anti-retaliation regulation) which provides

> § 1630.12 Retaliation and coercion.
> (a) Retaliation. It is unlawful to discriminate against any individual because that individual has opposed any act or practice made unlawful by this part or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce any provision contained in this part.
>
> (b) Coercion, interference or intimidation. It is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the

> exercise of, any right granted or protected by this part.

The same pattern appears in the Pregnant Workers Fairness Act regulations and interpretive guidance. The regulation bars retaliation and separately bars coercion, intimidation, threats, harassment, and interference, and the guidance states that threatening termination if an employee files a charge is covered, 29 C.F.R. § 1636.5(f)(2):

> It shall be unlawful to coerce, intimidate, threaten, harass, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the PWFA.

See also 29 C.F.R. pt. 1636 app. A, 29 C.F.R. pt. 1636 app. A.

## SECOND ISSUE

> Did the trial court err by granting summary judgment to Defendant on the grounds that Plaintiff failed to establish she sustained an adverse employment action for purposes of her constructive discharge by resignation effective September 25, 2019 when the Plaintiff established a credible threat to discharge and intolerable working conditions?

Standard of Review

This Court reviews the district court's summary judgment decision de novo, applying the same standards as the district court. Burge v. Parish of St. Tammany, 187 F.3d 452, 464 (5th Cir.1999).

Argument

"[A] plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired. However, in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable."

Perret v. Nationwide Mut. Ins. Co., 770 F.3d 336, 338-39 (5th Cir. 2014) (citations omitted). While there was no explicit ultimatum given, it was clear to Hall that her only choice was to accept the racially discriminatory working conditions she reasonably perceived "as is" or resign.

At the August 7, 2019 meeting, the Sheriff made it clear to all present if additional racial complaints were made, that person would need to "hit the door" and leave her employment. Other Nurses in good faith believed, due to the Sheriff's intimidation, that they would be fired if they complained again about race discrimination. Nurse McFarland ROA.2997. RE Tab 5. Nurse Lester, Declaration ¶10. ROA.2974. RE Tab 6. The employees were instructed to accept the working conditions as is, even if racially discriminatory.

Ms. Hall put in her resignation on August 7, 2019, as a direct result of the threat made at the meeting

that same day. Exh 10, pg 1. ROA.3124. (August 7, 2019: “Quit - Hostile Working Environment”) The Sheriff convinced her to stay saying things (racially discriminatory practices) would change. She still gave her two weeks’ notice. Exh CH-DEC ¶12 ROA.2974. And when the culture did not change, when the HSA finally hired was a white female, she resigned and was constructively discharged on September 25, 2019. Exh 10, pp 2-4. ROA.3126 (“I can no longer work under these stressful work conditions combined with unfair and unequal practices.”) Exh CH-DEC ¶13 ROA.2975. Her personnel file shows Hall resigned again on September 25, 2019. Exh 10 ROA.3125 (Reason for Termination: Stressful working conditions plus unfair + unequal work standards.”)

Threats alone are enough to support a constructive discharge claim. Perret v. Nationwide Mut. Ins. Co., supra. In other cases, discrimination or retaliation

alone is not enough to support a constructive discharge; there generally must be aggravating circumstances, such as harassment or humiliation aimed at driving the employee out, demotion, reduced pay, degrading reassignment, or other facts showing the employer was effectively pushing the employee to quit. See Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157 (5th Cir. 2007); Brown v. Kinney Shoe Corp., 237 F.3d 556 (5th Cir. 2001). Threats, as argued above are a part of the circumstances constituting an intolerable work environment.

When combined with the threats made in the August 7, 2019 meeting, the following practices created intolerable working conditions: use of the "N" word during training and during a non-training break. Exh CH-DEC ¶9. ROA.2971. The second time it was played, it was "just for fun" according to JPCC Major LeBlance. Exh CH-DEC ¶9 ROA.2972. Also the practice of preferring

white nurses over blacks contributed to the hostility. Exh CH-DEC ¶10(1). ROA.2972. Black nurses were treated less favorably than white nurses. Exh CH-DEC ¶7. ROA.2969 See Exh CH-DEC ¶6 where Reison, the new white supervisor, took harassing actions like placing Hall, a senior nurse, on the night shift, moved her desk unnecessarily several times and for no apparent reason, told could not have a cell phone, took action to fire blacks and hire whites, Hall and other black nurses were questioned about medical treatment provided to blacks, required to work longer, harder hours, was excluded from the nurses station, and giving the white nurses extra breaks to smoke. ROA.2968. There were other instances where blacks were generally treated less favorably. Exh CH-Dec ¶7. ROA.2970. There was an unspoken racial culture where whites were treated more favorably. Exh CH-DEC ¶7. ROA.2969. Exh McF-DEC ¶¶5. ROA.2988. RE Tab 5; Exh CL-DEC ¶7. ROA.2996. RE Tab 6.

Even the Sheriff acknowledged in a meeting with Hall on July 18, 2019 ". . . that the difference in the way Reison (white) and Hall (black) were being treated looked like discrimination." Exh CH-DEC ¶8. ROA.2971. But Plaintiff Hall's complaints fell on deaf ears: "Neither the Warden nor the Sheriff requested any information from her about the substance of any complaints; they did not request she put the complaints in writing." ROA.2971. To make things worse, they told her to tell the black nurses to stop complaining about discrimination.

Importantly the use of "N" word and the Sheriff's action, or lack thereof, is troubling and greatly contributes to an intolerable hostile work environment. On or about July 19, 2019, when Hall complained about the use of the "N" word in a training film, the Sheriff indicated to Plaintiff that he believed there were grounds to believe the training video film was

racial since it used the "N" word. However, Sheriff Brown did not take any action to remove the film or the racial epithet. Exh AB-1 (3/14/23) 113:6-114:21[7]. ROA.3080. In fact, the video was not removed from the training class. And, another second film unrelated to any training with the "N" word was used. Exh CH-DEC ¶8. ROA.2981. And, the Sheriff and LMC acted together to continue playing the training video. When the Sheriff and LMC were made aware of Ms. Hall's EEOC Charge and the time to respond to the EEOC about the training films occurred, a cover write up of LeBlance's actions happened on January 23, 2020, some six months after the incident, when a UOR was executed. Exhibit 14. ROA.3129. The Sheriff's position statement written by LMC HR Director Tillman is dated January 27, 2020.

[7] Sheriff Brown changed his testimony in his second deposition and stated the video wasn't used anymore. Exh AB-2 51:8-24.ROA.3096. This change can not be considered at summary judgment as all inferences are to be taken in favor of the non-mover, Plaintiff. His changed testimony need not be believed by a jury.

Exhibit 223. The Sheriff never removed the offensive training video. Hall heard from other black nurses that the same video was being used after her complaints. Exh CH-DEC ¶8. ROA.2981. The film continued to be used. Exh CL-DEC¶7(5) ROA.2996. (Lester attended training, heard the a similar video containing the "N" word, in a class held *after* Hall's)

By his authority over the plaintiff, when a supervisor makes a single racial slur, it exacerbates the severity of the remark and creates an issue of the existence of a hostile work environment. Ash v. Tyson Foods, Inc., 546 US 454, 456, 126 S.Ct. 1195, 1197 (2006)(use of the term "boy" addressing African-American employees may by itself show racial animus) Permitting and sponsoring the broadcast of the "N" word during training is a severe form of a racially hostile work environment. While the word was not directed personally toward Ms. Hall, her approved exposure to it

was a severe form of harassment. The "N" word has been described as "No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans." This was written by U.S. Supreme Court Justice Kavanuagh while he sat on the Court of Appeals for the District of Columbia. Ayissi-Etoh v. Fannie Mae (D.C. Cir. 2013) 712 F.3d 572, 580. The Second, Fourth, Fifth Sixth, Seventh and Eleventh Circuits have joined the D.C. Circuit: the Fifth Circuit recognized that "[p]erhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as [the N-word] by a supervisor in the presence of his subordinates." Woods v. Cantrell, 29 F.4th 284, 285 (5th Cir. 2022) (quoted sources omitted). See also Rodgers v. Western Southern Life Ins. Co., 12 F.3d 668,

675 (7th Cir. 1993) (citation and internal quotation marks omitted); and Ezell v. Potter, 400 F.3d 1041, 1048 (7th Cir. 2005) (stating "in the case of racial and ethnic slurs, some words are so outrageous that a single incident might qualify for a hostile environment claim").) The Fourth Circuit followed Rogers in Spriggs v. Diamond Auto Glass, adding that "[f]ar more than a mere offensive utterance, the word 'nigger' is pure anathema to African-Americans." 242 F.3d 179, 185 (4th Cir. 2001) (citation and internal quotation marks omitted).) The Sixth Circuit also does "not exclude the possibility that only one or two incidents of race-based harassment may be so severe as to constitute a hostile work environment." Reed v. Procter & Gamble Mfg. Co. (6th Cir. 2014) 556 Fed. Appx. 421, 433 n.2) (citation omitted). The Eleventh Circuit has held that even one-time use of the word can constitute severe harassment. Smelter v. S. Home Care Servs., 904 F.3d

1276, 1286 (11th Cir. 2018) ("Southern Home argues that Smallwood's 'one-time use' of ['nigger'] was insufficient to establish severity as a matter of law. We strongly disagree."). In Daniel v. T & M Protection Resources, LLC 689 Fed. Appx. 1(2nd. Cir. 2017), the Second Circuit reversed the district court's finding that the one-time use of the N-word by a supervisor could not, by itself, support an hostile work environment (HWE) claim as a matter of law.

While a direct supervisor did not utter the word in the video, a high ranking, well connected training officer who had temporary authority over Hall caused Ms Hall to be exposed to it and caused it to be said and then repeated. Major LeBlance further played a second video during a break in training which contained the "N" word again "for fun". Exh CH-DEC ¶8. ROA.2981. Ms. Hall felt threatened and as though LeBlance was taunting her. Sheriff Brown's benign response to her

complaint contributed to its offensiveness. Thus, the use of the "N" word in this manner constitutes severe hostile work environment or at the very least contributed to the great weight of the hostile work environment at JPCC. LaSalle/Sheriff Brown appeared to know the seriousness of the situation due to the cover up discipline of LeBlance six months later described above.

If there is a retaliatory constructive discharge, it permits the motivating factor burden to apply. Smith v. Xerox Corp., 602 F.3d 320, 327 (5th Cir. 2010). Applied to the scenario here, a statement by a company decision maker that employees will be fired if they complain again about discrimination again against a backdrop of ongoing discriminatory working conditions is highly relevant because it shows badgering or intimidation calculated to deter protected activity and may also suggest an intent to make conditions

intolerable. But the Fifth Circuit cases do not establish a rule that such a threat, standing alone, automatically justifies resignation or amounts to constructive discharge. It does lay the ground work for intolerable work conditions.

The Fifth Circuit has also identified recurring facts that may support such a finding. Those include demotion, pay cuts, diminished duties, reassignment to degrading work, reassignment under a younger supervisor, pressure or humiliation intended to make the employee resign, and retirement-related pressure or continued employment on materially worse terms, Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157 (5th Cir. 2007); see also Johnson-Luster v. Wormuth, Civ. A. No. 19-2235 2022 WL 767837(E.D. La. Mar. 14, 2022). These factors are not a rigid checklist, but they illustrate the sort of materially worsening conditions or resignation-focused mistreatment that

typically separates constructive discharge from ordinary discrimination or retaliation claims.

A central theme in the Fifth Circuit cases is that constructive discharge requires more than the showing needed for hostile work environment liability. The circuit has said that the plaintiff must demonstrate a greater degree of harassment than the minimum required for a hostile-environment claim, Brown v. Kinney Shoe Corp., 237 F.3d 556 (5th Cir. 2001); Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157 (5th Cir. 2007). Here, the combination of the hostile work environment including the use of the "N" word, coupled with the Sheriff's repeated attempts to stop race based complaints along with a clear threat to fire nurses who complain, is sufficient to establish an intolerable work environment and constructive discharge.

**THIRD ISSUE**

Did the district court err by considering inferences in favor of Defendant when it found as a matter of law that Plaintiff did not establish a hostile working environment where both racially offensive conduct and practices contributed?

Standard of Review

This Court reviews the district court's summary judgment decision de novo, applying the same standards as the district court. Burge, supra.

Argument:Hostile Working Environment

The offensiveness of a work environment includes an analysis of what a reasonable person would find offensive and whether the particular plaintiff had a subjective perception that it is abusive. Harris v. Forklift Systems, Inc.,, 510 US 17 at 21-22, 114 S.Ct. at 371. Title VII " 'evinces a Congressional intention to define discrimination in the broadest possible terms. Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in extenso

the parameter of such nefarious activities.' "Rogers v. Equal Employment Opportunity Comm'n, 454 F.2d 234, 238 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). At Page 23, the *Harris* Court stated, "But we can say that whether an environment is 'hostile" or "abusive' can be determined only by looking at all the circumstances."

In its analysis of all the circumstances, the trial court found inferences in favor of Defendant such as finding that Plaintiff fomented Nepotism so she shouldn't complain, without a commensurate showing of Hall hired family members; that her hiring a black nurse was the same "nepotism" that she now "decries".[8] Thus, the trial court inferred no hostile work environment based on nepotism: many management positions were held by whites who were related. Major LeBlance over the PREA training is related to the

[8] In reality, while Hall was DON four black and two white nurses were hired.

Sheriff's Secretary (Ms. Pullig) and Capt. Pullig is Major Leblance's mother. Lt. Mandy LeBlance was his wife. His family member including his son is known to have worked around JPCC. In the female hall was LeBlance's mother, Betty Pullig. Thus several high ranking deputies were related by blood and marriage, and worked directly under the Sheriff.

Next, Plaintiff argued that a training film which included the utterance of the word "nigger" contributed to a hostile working environment for the black nurses, including Plaintiff Hall. The trial court discounted any discrimination because the word was spoken in a rap song. The trial court wrote "It is thus an incredible leap for Nurse Hall to equate this incident to cases where supervisors and/or coworkers use the n-word." The Court cited to cases that held "mere utterance of an . . . eipthet which engenders offensive feelings in an employee, does not sufficiently affect the conditions

of employment to implicate Title VII." But the Court failed to consider that Major LeBlance played a second video the next day during a break. It also contained the "N" word. But this time Major LeBlance told Ms. Hall that it was callously played "just for fun". It wasn't required by business or a training film. Exh CH-DEC ¶9 ROA.2972. Hall believed Leblance was taunting and threatening her. Exh CH-DEC ¶9.ROA.2971.

When the Sheriff and LMC were made aware of Ms. Hall's EEOC Charge and the time to respond to the EEOC about the training films arrived, a cover up of discipline of LeBlance's actions happened on January 23, 2020, when a UOR was executed, some six months after the face. Exhibit 14. ROA.3129. The Sheriff's position statement written by LMC HR Director Tillman is dated January 27, 2020. Exhibit 223. The Sheriff never removed the offensive training video. Hall heard from other black nurses that the same video was being

used after her complaints. Exh CH-DEC ¶9. ROA.2971. The film continued to be used. Exh CL-DEC¶7(5) ROA.2996. (Lester attended training, heard the a similar video containing the "N" word, in a class held *after* Hall's)

The "N" word is the most egregious racial epithet and is considered a severe form of harassment. It was the Sheriff's indifferent reaction to that use that made it rise above the "mere utterance".

Combining with the above, several nurses including Hall, McFarland and Lester attested that there was an unspoken racial culture at JPCC that involved specific, enumerated employment practices where blacks were treated less favorably than whites. Exh CH-DEC ¶7. ROA.2969 RE Tab 4.; Exh AFM-DEC ¶5 ROA.2988; RE Tab 5, EXH CL-DEC ¶7 ROA.2996. RE Tab 6.

Sexual and racial hostile work environment claims are analyzed in the same framework as race. See

Meritor Sav. Bank, FSB v. Vinson, 477 US 57, 66, 106 S.Ct. 2399, 2404-2405 (citing with approval earlier hostile environment racial harassment cases) National R.R. Passenger Corp. v. Morgan, 536 US 101, 116 122 S.Ct. 2061, 2074, fn 10. (2002) There is no requirement that the plaintiff suffer any psychological harm. Harris v. Forklift Systems, Inc., 510 U.S. 17 at 22, 114 S.Ct. 367 at 370 (1993). Also there is no requirement that the Plaintiff suffer a loss of a tangible job benefit or actual injury. Harris v. Forklift Systems, Inc., 510 U.S. at 21, 114 S.Ct. at 370. The hostile work environment must alter the conditions of the employment and create an abusive working environment. Meritor v. Sav. Bank FSB v. Vinson (1986) 477 US 57, 67, 106 S.Ct. 2399, 2405-06. All of the circumstances are considered to determine if the harassment unreasonably interferes with an employee’s work performance. Harris v. Forklift

Systems, Inc., 510 US at 23, 114 S.Ct. at 371. Farragher v. City of Boca Raton, (1998) 524 US 775, 787-788, 118 S.Ct. 2275, 2283. However, a worker who has the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive racial harassment is not to be penalized. Compare generally Dey v. Colt Const. & Develop. Co. 28 F.3d 1446, 1455 (7th Cir. 1994) where the Court wrote:

> In our view, the mention in Harris of an unreasonable interference with work performance was not intended to penalize the employee who possesses the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive sexual banter from one of her superiors. As Justice Scalia separately explained in *Harris*, the test under Title VII "is not whether work has been impaired, but whether working conditions have been discriminatorily altered." --- U.S. at ----, 114 S.Ct. at 372 (Scalia, J., concurring).
>
> * * *
>
> That test can certainly be met even where job performance is not tangibly affected. The absence of a noticeable

> decline in job productivity should therefore not be unduly emphasized where there is ample evidence showing that the campaign of harassment had an impact on its target and made it more difficult for her to do her job. See Harris, --- U.S. at ----, 114 S.Ct. at 372 (Ginsburg, J., concurring); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462-63 (9th Cir.1994).

The hostile work environment here affected Ms. Hall to the point that she stepped down from her DON/HSA position, seriously considered moving her home and decided to leave her employment. Exh CH-DEC ¶¶6-7. ROA.2967.

The offensive practices included that as a black nurse, her desk was moved repetitiously for no reason, was required to work longer hours, and received fewer breaks. These are examples of interference with her workplace. As a result there was interference with terms and conditions of her employment. She suffered depression, anxiety, hair loss, sleeplessness, loss of weight, stomach issues, and diarrhea during her

employment with the Sheriff. She sought and received medical attention after leaving her employment. Exh CH-DEC ¶15. ROA.2975. RE Tab 4.

Evidence of a hostile work environment experienced by others of which plaintiff became aware are also considered a part of the fabric and circumstances in the overall hostile work environment. Compare Adams v. Austal, U.S.A., LLC, 754 F.3d 1240, 1257-58 (11th Cir. 2014) (stating that employees could base their racial harassment claims on conduct that they were aware of); Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 335 (6th Cir. 2008) and Ziskie Mineta, 547 F.3d 220, 225 (4th Cir. 2008)(number of women experienced similar treatment). McGinest v. GET Service Corp, 360 F3d 1103, 1117 (9th Cir. 2004)."(if racial hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff."); Hawkins v.

Anheuser-Busch, Inc., 517 F.3d 321, 335-36 (6th Cir. 2008) (concluding that evidence of a hostile work environment may include acts of harassment that the plaintiff becomes aware of during her employment that were directed at others and occurred outside her presence). Here, Hall heard from others that the training video was not removed, that Nurse Lester, a white female, was approached by Reison about having a black boyfriend EXH CL-DEC ¶7(2)ROA.2996. Black nurses were disrespected. EXH CH-DEC ¶7(1)ROA.2969; Nurse Lowery complained about the confederate flag on an employee's car to no avail EXH CH-DEC ¶7(6)ROA.2970, among others. EXH CH-DEC ¶7. ROA.2969.

Employment practices rather than merely offensive language is also evaluated as a part of the circumstances of the hostile work environment. Chaney v. Plainfield Health Ctr, 612 F.3d 908, 913 (7th Cir. 2010)(nursing home that honored patients' requests for

white only treatment violates Title VII); Hall v. Gus Const. Co., Inc, 842 F.2d 1010, 1013-104 (8th Cir. 1988)(refusal to repair truck driven by female); Williams v. General Motors Corp, 187 F.3d 553, 563 (6th Cir. 1999)(work sabotaging behavior created hostile work environment); Hicks v. Gates Rubber Co., 833 F.2d at 1415 (evidence of threats of physical violence and incidents of verbal abuse--calling plaintiff "Buffalo Butt"--properly considered); McKinney v. Dole, 765 F.2d 1129, 1139 (D.C.Cir.1985) (acts of physical aggression properly considered). In *McKinney*, the court stated:

> We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of an employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now. Rather, we hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for

> the sex [race] of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.

Id. at 1138 (footnote omitted). Discriminatory practices and working conditions as described herein support a finding of a hostile work environment.

The discriminatory practices fostered by Reison and tolerated by the Sheriff consisted of (1) On July 25, 2019, Reison placed Hall on the evening shift (10am to 6pm) as a Mental Health Nurse; the Mental Health Nurse is ordinarily a LPN nurse. Ms. Hall is a RN, a higher qualified nurse. When she resigned, Nadia Starks, a white female, took over the position. (2) Reison moving her desk repetitiously at least 3 times to inconvenient locations; Reison gave no justification but only said Hall would like it more; (3) instituting a cell phone policy that prohibited nurses other than administrative nurses who were white from bringing a

cell phone to work; all day shift members, or administrative staff who worked Monday-Friday. Hall was administrative staff the entire time until declared not by Reison. She was not informed by HR that she was not administrative staff. Tiffany Pullig, white female, daughter of the Sheriff's secretary, Kayne Pullig, was non-administrative staff but was allowed to bring her cellular telephone to work. (4) Jessie Reison hired white nurses and let or caused other black nurses to quit or be fired; (5) others told her that they were questioned over medical care provided to black prisoners unlike questions about treatment of white prisoners (6) black nurses were given the more laborious and time consuming task of taking medical history from I.C.E. detainees which required translators; white nurses were given the easier task of merely taking vital signs which did not require a language translator. As a consequence, black nurses

were having to work 4-5 hours longer. (7) she observed that it took longer for black inmates to receive dental care ; she tried to have a black dentist hired but that was denied because it cost too much; but Reison was able to hire a dentist. (8) Hall was instructed by Ducote and LeBlance to have Plaintiff Hill to wear a coat during a very hot time during the summer. (9) Defendants enforced during intake a discriminatory grooming codes for black inmates enforcing a hair grooming code unequally. (10) Reison began enforcing a policy of excluding non-administrative black nurses were not allowed in the nurse’s station such McFarland, herself and Plaintiff Hill. (11) no black nurses smoked cigarettes. Smokers, white nurses, received extra breaks during the day to smoke cigarettes. Hall asked for additional breaks to make up for it but was denied. EXH CH-DEC ¶6. ROA.2967.

There was a racially offensive culture at JPCC: (1) blacks were treated less favorably than whites. White employees acted like they were superior and talked down to blacks. Even some black deputies agreed it was happening. (2) This culture even went down to the inmates: most if not all trustys were white; the vast majority of the inmates were black. (3) Other conditions contributed to the culture and hostile work environment: many management positions were held by whites who were related. Major LeBlance over the PREA training is related to the Sheriff's Secretary (Ms. Pullig) and Capt. Pullig is Major Leblance's mother. Lt. Mandy LeBlance was his wife. His family member including his son is known to have worked around JPCC. In the female hall was LeBlance's mother, Betty Pullig. (4) There were racial epithets tolerated and allowed in the training videos. Ms. Carla Hall was told the same videos she saw and heard continued to be played past

the time she complained. (5) After she filed this lawsuit, she learned she had been written up twice: July 19, 2019 (the day after her meeting with Sheriff Brown and Warden Ducote) and August 6, 2019 (the day before the August 7, 2019, meeting in the warden's office). She was never informed of these write ups. (6) Ms. Carla Hall became aware and saw a captain whose vehicle had a Confederate flag license plate on it. She was told by Nurse Susan Horton, a white female, Horton that she complained to the Warden but the Warden replied that he can't make the officer stop driving his car and not display the flag. (7) At JPCC, there is no confidential means to complain about race discrimination. It was intimidating that any time an employee complains, the Sheriff and the Warden berated nurses for complaining. They discouraged complaints rather than providing a safe harbor for them. EXH CH-

DEC ¶7. ROA.2969. Nurses McFarland ROA.2987 and Lester confirm the acts. ROA.2995.

Contributing further to the racially hostile work environment, she and others were told on August 7, 2018, to “hit the door” if she complained again. EXH CH-DEC ¶11. ROA.2973. RE Tab 4. These were not everyday complaints but complaints about race discrimination. The Sheriff’s terse remarks to hit the door or don’t complain anymore about race discrimination is a statement from their leader that he did not consider race discrimination as a worthy topic of discussion, dismissing out of hand the Plaintiff’s concerns about discrimination. Shutting the door on race complaints, opened the door and invited potential discrimination, creating a hostility around race.

*Employer Liability*

An employer has a legal duty to rectify problems of which it has actual or constructive knowledge. Meritor Sav. Bank, FSB v. Vinson, 477 US at 72, 106 S.Ct. At 2408. Constructive knowledge is shown where the circumstances show knowledge. Waltman v. International Paper Co., 875 F.2d 468, 471 (5th Cir. 1989)(sexually explicit graffiti displayed in workplace). Typically, only when the hostile work environment is pervasive (i.e., egregious, numerous and concentrated) is when the employer becomes aware without a direct complaint. Baker v. Weyhauser Co., 903 F.23d1342, 1346 (10th Cir. 1990); Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 105, fn 4 (3rd Cir. 2009). Here, through the individual meetings with Nurse Hall and the nurses' group meeting, it is shown that Ducote and Sheriff Brown were aware of race discrimination complaints but took no action to investigate or remediate. They in fact denounced complaints themselves (and not the

substance of the complaints) and threatened those present with discharge. To Sheriff Brown and Warden Ducote, the complaints were the problem, not the hostile work environment or discriminatory conditions themselves.

Under such circumstances the employer is liable for the acts of its supervisors because it can not establish the affirmative defenses set out in Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Farragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Under this defense, an employer will not be vicariously liable for harassment by a supervisor[9] if it can show: "(a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff

[9] Much of the hostile work environment that consists of employment practices is attributable to acts of a supervisor such as Reison.

employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Watts v. Kroger Co., 170 F.3d 505, 509-10 (5th Cir.1999). These affirmative defenses are conjunctive; that is, if the employer fails to prove one of the prongs, then it fails to establish its affirmative defense. Boh Brothers, supra at 466 ("Because the two prongs of the Ellerth/Faragher affirmative defense are conjunctive and there is sufficient evidence to support the jury's determination on prong one, we need not consider prong two: whether Woods satisfied his duty to take full advantage of his employer's preventative and corrective measures."). No preventative action was taken, no investigation or inquiry took place, even in the face of the Sheriff acknowledging that it may look like discrimination. Exh CH-DEC ¶8. ROA.2970.

Plaintiff Hall did not fail to reasonably complain: she did so on July 18, 2019 but was told the Sheriff didn’t need that kind of talk. Exh CH-DEC ¶8. ROA.2970. Then she was told callously on August 7, 2018, to “hit the door” if she complained again. EXH CH-DEC ¶11. ROA.2973. RE Tab 4. These were not everyday workplace complaints but complaints about race discrimination.

Contrary to any effective policy to prevent harassment or a hostile work environment, the Sheriff and the Warden specifically informed black nurses to stop complaining rather than the Sheriff investigating or remediating the complaints or leave their employment. The Sheriff actually informed Ms. Hall that the complained of practices looked like discrimination but yet did not exercise reasonable care. See Expert Thomas’ Report pg 5 wherein she compares the Sheriff’s conduct against HR industry standards to show his conduct to be unreasonable. Exh

DT-REPORT, pg 5. ROA.3009. The Report provides that under accepted HR standards, the employer should investigate, remediate and report back to the complainant. Thomas states complaints should be handled confidentially. See Exh DT-REPORT, pp 5-6. ROA.3009. Any written policy of the Sheriff prohibiting harassment is overshadowed and contradicted by the Sheriff's outrageous and intimidating behavior in denouncing known complaints without any investigation. And it is shown that Plaintiff Hall did not unreasonably fail to take advantage of the Sheriff's policy after at least two direct complaints by Hall and one by Hill; further the Warden and Sheriff otherwise became aware of complaints of discrimination through constructive knowledge.

Hall's unequal treatment and her complaints about that treatment became known to the Warden and Sheriff. On July 18, 2019, the Warden and Sheriff Brown called

Plaintiff Carla Hall into a meeting after she had stepped down. EXH CH-DEC ¶8.ROA.2970. They asked her pointedly if she were happy because they had heard of racial complaints by black nurses. She felt as though she were being grilled by the Warden and Sheriff. She believed they were aware of any complaint of race discrimination that or other coworkers had about race at JPCC. They acknowledged she was making race complaints because Reison was getting the hires Carla Hall had requested for ICE purposes like Quality Assurance Nurse, DON, a dedicated Mental Health Nurse, a med-temp nurse, and extra staff required by ICE that Carla Hall had asked for the help like the additional staff and the necessary training and for Dr. Hearn to help. The Sheriff acknowledged that the difference in the way Reison and Hall were being treated looked like discrimination. That didn't happen until Reison was hired into Carla Hall's position. They told her that

they didn't need that kind of talk (i.e., complaints) and to stop it. Hall stated her complaints of discrimination to the Sheriff and Ducote. Neither the Warden nor the Sheriff requested any information from her about the substance of any complaints; they did not request she put the complaints in writing.

The Warden and Sheriff in particular told Carla Hall to tell the black nurses to stop their complaints and singled out Nurse Kimble to stop her discriminatory complaints. At this point, Hall did not feel free to make any complaints about discrimination to anyone associated with the Sheriff or the Warden. They didn't ask or seem to want to talk to Nurse Kimble but rather seemed to want Nurse Hall, as a black employee, to speak to Kimble, another black employee. Warden Ducote admits to knowing about a race based conflict among nurses who he believed was trying to turn the complaints into a racial issue. He reported that to

the Sheriff. Exh TD 44:8-25. ROA.3112. The Sheriff can not deny this. Exh AB-2 27:16-23. ROA.3096. This meeting constitutes a hostile interrogation and can constitute a materially adverse employment action for retaliation purposes. Compare Davis v. Fleming Cos., 55 F.3d 1369, 1372 (8th Cir. 1995) abrogated on other grounds, Torgerson v. City of Rochester ,643 F.3d 1031 (8th Cir. 2011)(plaintiff questioned by high ranking company officials about his "character assassination" of co-worker after reporting sexual harassment evidence of intent to retaliate).

The trial court erred in not finding Plaintiff presented summary judgment evidence to support a hostile work environment claim. Under the totality-of-the-circumstances approach, such conduct as employment practices, use of the "N" word, failure to investigate complaints contribute to a hostile environment if it reflects discriminatory hostility and is severe or

pervasive enough to alter working conditions, proposition supported by Wantou v. Wal-Mart Stores Tex., L.L.C., 23 F.4th 422 (5th Cir. 2022); Barnes v. McHugh, No. 12-2491 (E.D. La. July 11, 2013);

## CONCLUSION OF THE BRIEF

The district court should be reversed and the case with claims for constructive discharge and hostile work environment remanded for further proceedings consistent with this Court's Opinion.

Respectfully submitted,

/s/ Nelson W. Cameron

Nelson W. Cameron
Attorney at Law
675 Jordan Street
Shreveport, LA 71101
(318) 226-0111
**Attorney for Appellant**
**CARLA HALL**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**

**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN,** ***Sheriff, Jackson Parish in his individual and official capacity;*** **TIM DUCOTE,** ***Warden, Jackson Parish Correctional Center, in his individual and official capacity*****,**

**Defendants - Appellees**

**CERTIFICATE AND PROOF OF SERVICE**

I, Nelson W. Cameron, a member of the bar of the United States Fifth Circuit Court of Appeals do HEREBY CERTIFY that two copies of the attached Original Brief and an electronic copy thereof filed on behalf of the -Appellant, Plaintiff Carla Hall Patrick has been served upon: Attorneys for Defendants, Stephen P. Beiser, McGlinchey Stafford, PLLC, 601 Poydras Street, Suite 1200 New Orleans, LA 70130 by placing same in the United States mail, with sufficient first class postage prepaid thereon and by the Court's ECM system.

All parties who need to be served, have been served.

Shreveport, Louisiana, this 16th day of May, 2026.

*/s/ Nelson W. Cameron*
NELSON W. CAMERON

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**Case No. 25-30702**

**CARLA D. HALL,**

**Plaintiff - Appellant,**

**v.**

**LASALLE, MANAGEMENT COMPANY, L.L.C.; ANDY BROWN,** ***Sheriff, Jackson Parish in his individual and official capacity;*** **TIM DUCOTE,** ***Warden, Jackson Parish Correctional Center, in his individual and official capacity*****,**

**Defendants - Appellees**

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

1. This brief contains 11,530 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or
2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Word Perfect 8.0 in Courier New, 14 point.

3. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE,

OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN Fed. R. App. P. 32 (a)(7), MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

*/s/ Nelson W. Cameron*
NELSON W. CAMERON